IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| SHANNON KENNY | : | |
| 90 Franklin Ave, Apt. 2 | : | CIVIL ACTION NO.: _____ |
| Hallstead, PA 18822 | : | |
| | : | JURY TRIAL DEMANDED |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| HALLSTEAD-GREAT BEND POST 357 | : | |
| OF THE AMERICAN LEGION HOME & | : | |
| CLUB ASSOCIATION | : | |
| PO Box 824 | : | |
| Hallstead, PA 18822 | : | |
| | : | |
| Defendant. | : | |

---

## COMPLAINT – CIVIL ACTION

Plaintiff, Shannon Kenny ("Plaintiff"), by and through her undersigned attorney, hereby files this Complaint against Defendant Hallstead-Great Bend Post 357 of the American Legion Home & Club Association ("Defendant"), and alleges as follows:

## INTRODUCTION

1. Plaintiff brings this Complaint contending that Defendant has violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* by discriminating against and ultimately terminating her in retaliation engaging in protected activity under the FLSA.

2. Specifically, Plaintiff contends that Defendant demoted and subsequently terminated her shortly after she filed an internal complaint regarding Defendant's failure to pay overtime compensation and informed Defendant that she had contacted the Labor Board regarding the same.

3. Plaintiff brings this action under the FLSA and PMWA for monetary damages to seek redress for Defendant's willful, unlawful, and improper conduct.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 29 U.S.C. § 216(b), which provides, in relevant part, that suit under the FLSA "may be maintained against any employer . . . in any Federal or State court of competent jurisdiction." See 29 U.S.C. § 216(b).

5. This action is authorized and initiated pursuant to the FLSA.

6. This Court has original jurisdiction over this matter pursuant to 29 U.S.C. § 216(b), and 28 U.S.C. § 1331, as it is an action arising under the laws of the United States.

7. The venue in this district is proper pursuant to 28 U.S.C. § 1391(b), as the parties reside in this judicial district, doing business therein, and the unlawful practices of which Plaintiff is complaining were committed in the Commonwealth of Pennsylvania.

## PARTIES

8. Plaintiff Shannon Kenny currently resides at 90 Franklin Ave, Apt. 2, Hallstead, PA 18822.

9. Upon information and belief, Defendant Hallstead-Great Bend Post 357 of the American Legion Home & Club Association is a business entity existing under the laws of the Commonwealth of Pennsylvania and is engaged in business in the Middle District of Pennsylvania with a mailing address of PO Box 824, Hallstead, PA 18822.

10. Defendant is an "employer" and covered by the FLSA.

11. During the course of her employment with Defendants, Plaintiff was engaged in commerce within the meaning of the FLSA in that she performed work involving goods purchased and/or ordered from locations outside of Pennsylvania. In this regard, as part of her job duties, Plaintiff frequently drove on interstate highways and crossed state lines (from Pennsylvania to New York and back) in order to make out-of-state purchases for Defendant and to transport said goods back to Defendant. For example, Plaintiff regularly traveled to Sam's Club in Vestal, NY via Interstate Routes 81 and 86, in order to purchase and transport back food and supplies essential to the operations of Defendant's business. Plaintiff also traveled to and/or placed telephonic orders with numerous other stores/vendors in the State of New York, including, but not limited to Best Buy, Wegmans Grocery Store, Hannan Refrigeration, The Tap Guy, Walmart, Party City, Dollar Tree,

Behlog & Sons. Plaintiff then worked with these goods, using them to perform her tasks for Defendant, including, but not limited to serving Defendant's customers.

12. At all times relevant hereto, Plaintiff has been employed by Defendant and is entitled to the protections of the FLSA.

13. At all times relevant hereto, Defendant acted or failed to act through its agents, servants and/or employees thereto existing, each of whom acted at all times relevant hereto in the course and scope of their employment with and for Defendant.

## FACTUAL ALLEGATIONS

14. Paragraph 1 through 13 are hereby incorporated by reference as though the same were fully set forth at length herein.

15. Plaintiff began her employment with Defendant on or around March 4, 2019, when she was hired as a Bartender at Defendant's club and bar in Hallstead, PA.

16. Plaintiff was originally scheduled to work just Saturdays.

17. Due to her excellent work performance, Plaintiff's schedule was soon expanded to three (3) days per week, and then, by 2020, five (5) days per week.

18. From November 2020 until her termination on or around May 3, 2021, Plaintiff's regular work schedule was five (5) days per week. Plaintiff was

also required to come in for two (2) hours per day on her "off" days for Bar Manager training for a significant portion of this time period.

19. Accordingly, from November 2020 until her termination on or around May 3, 2021, Plaintiff typically worked approximately forty (40) to fifty-five (55) hours per week.

20. As a Bartender, Plaintiff received an hourly rate plus overtime compensation for hours worked over forty (40) in a week.

21. Plaintiff also received $10 (or more) per week for fuel and travel expenses associated with her frequent trips across state lines to purchase food and supplies for Defendant in New York.

22. In January 2021, Plaintiff was promoted to the position of Bar Manager.

23. When applying for the position, it was Plaintiff's understanding, based on how Defendant's previous Bar Manager had been compensated and conversations with management, that she would receive a base salary, while also continuing to receive overtime compensation.

24. Indeed, when Plaintiff asked about the new position, Ken Wescott ("Mr. Wescott"), Chaplain, Jay Haggerty ("Mr. Haggerty"), Vice Commander, and Mike Welch ("Mr. Welch"), Sergeant of Arms, told Plaintiff that the previous Bar Manager, Sharon Smith, had received a base salary of $300 per week, but that she

did not receive hourly pay or overtime because she was "hardly there" and did not bartend.

25. At the time, they told Plaintiff, "We'll make sure you get what she had," referring to the previous Bar Manager's salary of $300 per week.

26. However, Defendant ultimately only paid Plaintiff an extra $50 per week for being Bar Manager, telling Plaintiff that was all Defendant could give her at the time.

27. As Bar Manager, Plaintiff was responsible for writing the payroll checks for the bar staff, including herself, which were then approved and signed by Judy Chauncey ("Ms. Chauncey"), Defendant's Finance Officer and Bar Manager, as well as the President, Jay Haggerty.

28. Accordingly, when Plaintiff wrote her payroll checks, she included all her hours worked, including any overtime compensation, on her check, which was then approved and signed by Defendant.

29. On or around March 30, 2021, Plaintiff developed symptoms consistent with a sinus infection, and her doctor took her off work from March 30, 2021 to April 2, 2021.

30. While Plaintiff was forced to come into work on April 3, 2021, she subsequently quarantined after her doctor diagnosed her with COVID-19.

31. Plaintiff returned to work on April 19, 2021 after her doctor-recommended quarantine, as well as a pre-approved vacation from April 12, 2020 to April 18, 2020.

32. While Plaintiff was out of work, Ms. Chauncey wrote Plaintiff's paycheck for the pay period of April 5, 2021 to April 11, 2021 and uncharacteristically separated her payment – of forty-seven (47) hours of vacation time – onto two checks, purportedly in recognition of Plaintiff's separate Bar Manager and Bartender duties.

33. On April 19, 2021, Plaintiff complained to Ms. Chauncey that if Defendant paid her for her Bar Manager and Bartender duties on two (2) separate checks, she would not receive any overtime compensation.

34. Ms. Chauncey did not respond to Plaintiff's complaint.

35. After returning to work, Plaintiff resumed writing her payroll checks, subject to Ms. Chauncey's approval.

36. On April 26, 2021, Plaintiff discovered that Ms. Chauncey had left a note for her that she had "some questions" about Plaintiff's paycheck for pay period April 19, 2021 to April 25, 2021, which she had declined to approve and sign.

37. Notably, said paycheck reflected approximately 9.5 hours of overtime compensation.

38. When Plaintiff inquired with Ms. Chauncey about her note, Ms. Chauncey told her that she wanted to separate the pay for Plaintiff's two positions (i.e. Bar Manager and Bartender) into two checks.

39. In explanation, Ms. Chauncey told Plaintiff, "We can't afford to pay you overtime. It's just too much money."

40. The following day, April 27, 2021, Plaintiff contacted the Pennsylvania Department of Labor & Industry, Bureau of Labor Law Compliance to inquire about the legality of Defendant's overtime compensation practices.

41. That same day, Plaintiff spoke to Ms. Chauncey, who said she was "not impressed" with Plaintiff's paychecks and that they amounted to "too much with the overtime."

42. In response, Plaintiff complained about Defendant's failure to pay her overtime compensation.

43. Plaintiff also informed Ms. Chauncey she had spoken with the "Labor Board" about Defendant's failure to pay her overtime compensation as an hourly employee.

44. Plaintiff told Ms. Chauncey that the Labor Board representative with whom she had spoken had advised that Defendant either had to pay her a salary or on an hourly basis plus overtime compensation.

45. Ms. Chauncey was upset that Plaintiff had contacted the Labor Board, and began shouting that with a number of personal issues she was dealing with, Plaintiff's complaints regarding overtime were the "icing on the cake."

46. On April 28, 2021, her day off, Plaintiff called the Club President, Mr. Haggerty, and advised him about her conversations with Ms. Chauncey and her refusal to pay her overtime compensation.

47. The following day, April 29, 2021, Mr. Haggerty came up to Plaintiff while she was bartending and told her she was being demoted back to Bartender.

48. When Plaintiff asked why, Mr. Haggerty told her, "I don't really know. That's what they voted for."

49. Shortly thereafter, a patron came up to Board Member Mike Welch ("Mr. Welch"), and complimented him on "finally having a good bar manager."

50. Mr. Welch responded, in reference to Plaintiff, "She's not the Bar Manager anymore."

51. Plaintiff advised Mr. Welch, "Well, Mike, I want to be, but Judy didn't want to pay me overtime."

52. When Mr. Welch responded that Ms. Chauncey did not sign Plaintiff's check because of her husband's medical appointment, Plaintiff explained that Ms. Chauncey had actually told her she needed to "think about it" because she didn't want to Plaintiff overtime.

53. Mr. Welch replied by discussing how much Plaintiff was making in front of the patron, and complained about how Plaintiff had "gone over Judy" by calling the Labor Board.

54. Plaintiff replied that as an employee, she had a right to call the Labor Board to ask questions and know the law.

55. On May 3, 2021, Plaintiff was terminated by Ms. Chauncey and Mr. Wescott upon her arrival for work.

56. Specifically, Ms. Chauncey approached Plaintiff while she was in her car and told her, "I need your keys. You're fired. I don't need to give you a reason."

57. It is Plaintiff's understanding that Defendant subsequently replaced her in her roles as Bar Manager and Bartender.

58. Upon information and belief, Defendant later responded to Plaintiff's claim for unemployment benefits by stating she was terminated because she wanted more money than Defendant could pay her.

59. It is believed and therefore averred that Defendant demoted and subsequently terminated Plaintiff in retaliation for engaging in protected activity under the FLSA by complaining about Defendant's failure to pay overtime compensation, as aforesaid.

60. Plaintiff's internal complaints regarding Defendant's failure to pay overtime compensation and Defendant's retaliation against her thereafter constituted protected activity under the FLSA.

61. As a result of Defendant's deliberate, willful, malicious, and unlawful actions, Plaintiff has suffered damages, including, but not limited to, loss of employment, earnings and earnings potential, loss of potential bonuses, and other economic damages, and has also suffered mental anguish, emotional pain and suffering, emotional distress, humiliation, and damage to her reputation.

## COUNT I
## FAIR LABOR STANDARDS ACT
## 29 U.S.C § 215, *et seq.*
## **RETALIATION**

62. Paragraphs 1 through 61 are hereby incorporated by reference as though the same were fully set forth at length herein.

63. Plaintiff engaged in protected activity under the FLSA as described above.

64. Shortly thereafter, Defendant began retaliating against Plaintiff in the manner describe above, demoting her and ultimately terminating her employment for reasons which are clearly pretextual.

65. By reason of the foregoing, Defendant, through their agents, officers, servants, and/or employees have violated the FLSA by discriminating against and

discharging Plaintiff in retaliation for engaging in protected activity under the FLSA.

66. As a result of Defendant's deliberate, unlawful, and malicious acts as set forth above, Plaintiff has suffered loss of employment, promotion benefits, earnings, earnings potential, raises, other significant economic benefits, emotional pain and suffering, emotional distress, and humiliation.

**WHEREFORE**, as a result of the unlawful conduct of Defendant, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and grant her the maximum relief allowed by law, including, but not limited to:

A. Back wages, front pay, and bonuses in an amount to be determined at trial, but no less than one hundred and fifty thousand dollars ($150,000);

B. Monetary compensation for the amounts expended by Plaintiff on health insurance premiums;

C. Punitive, compensatory, and/or exemplary damages in an amount to be determined at trial, but sufficient to punish Defendant for its intentional, negligent, willful, wanton, and/or malicious conduct;

D. Plaintiff's costs, disbursements, and attorney's fees incurred in prosecuting this matter;

E.   Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth by applicable federal law.

F.   Pre-judgment interest in an appropriate amount;

G.   Such other and further relief as is just and equitable under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,

**MURPHY LAW GROUP, LLC**

By:   /s/ Michael Groh
Michael Murphy, Esq.
PA Attorney I.D. No. 91262
Michael Groh, Esq.
PA Attorney I.D. No. 319296
Eight Penn Center, Suite 2000
1628 John F. Kennedy Blvd.
Philadelphia, PA 19103
TEL: 267-273-1054
FAX: 215-525-0210
murphy@phillyemploymentlawyer.com
mgroh@phillyemploymentlawyer.com
Attorneys for Plaintiff

Dated:   November 16, 2021

**DEMAND TO PRESERVE EVIDENCE**

The Defendant is hereby demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, to her potential claims and her claims to damages, to any defenses to the same, including, but not limited to electronic data storage, employment files, files, memos, job descriptions, text messages, e-mails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in this litigation.